IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

BETTY PEÑA PEÑA, et al
Plaintiffs                                     Civil No. 11-1624 (SEC)

v.                                             Civil Action
                                               Civil Rights
JOSE FIGUEROA SANCHA, Et al                    42 USC 1983
Defendants

## OPPOSITION TO MOTION TO DISMISS

COME now the appearing plaintiffs through the undersigned attorneys, and very respectfully aver and pray as follow:

## INTRODUCTION

On January 25th 2012, co-defendants, José Figueroa-Sancha, José Rosa Carrasquillo, Leovigildo Vazquez, Héctor M. Figueroa-Torres and Miguel Mejías Cruz filed a Motion to Dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. (See Docket Doc. 26) In sum, relying on boiler plate arguments and on a misconstruction of Ashcroft v. Iqbal, 129 S.Ct. 1937 (2009), supervisory defendants sustain that plaintiffs' complaint failed to establish a plausible Section 1983 claim (42 U.S.C.A. §1983) against them. Also, they argue that they are exempted from liability under the doctrine of qualified immunity and that plaintiffs failed to establish a sound cause of action under the First, Fourth, Fifth, Tenth and the Fourteenth amendment of the Constitution.

As thoroughly discussed in this motion, the complaint as drafted clearly establishes a plausible Section 1983 cause of action against the supervisory defendants for their own misconduct. Taken as a whole and accepting as true all

factual allegations, the complaint ascertains that the supervisory defendants not only were well aware of the unlawful conduct that resulted in the violations of plaintiff's constitutional rights and with deliberate indifference failed to adopt corrective measures. It is specifically alleged, beyond the speculative level, that they <u>personally and directly participated, oversaw, condoned and permitted the unfettered display of police brutality against the plaintiffs</u> while exercising their First Amendment Right of peaceful protest. Since the plaintiffs successfully set forth violations of clearly established rights under the Constitution of the United States, this Honorable Court should deny co-defendants motion to dismiss.

## I.   BRIEF SUMMARY OF THE ALLEGATIONS

On June 29th 2011, Betty Peña Peña, by herself and on behalf her minor daughter E.R.P., filed the present complaint for monetary and injunctive reliefs against several police officers for violations of their rights under the First, Fourth, Fifth, Ninth, Tenth and Fourteenth Amendment of the Constitution of the United States. Plaintiffs also invoked this Honorable Court supplemental jurisdiction with regard to constitutional violations under the laws of the Commonwealth of Puerto Rico. (First Amendment Complaint, Docket Doc.4) It is alleged that on June 30th, 2010, Betty Peña, a school teacher, and her minor daughter E.R.P., by then a high school student, peacefully participated in a protest that took place on the premises of the Capitol Hill in opposition to the closing of the Senate galleries to the general public. (<u>Id</u>. at ¶¶ 3.1-3.5)  A heavy contingent of police officers from the Tactical Operation Unit of the Puerto Rico Police Department, under the direct and personal supervision of Figueroa-Sancha, José Rosa Carrasquillo,

Leovigildo Vazquez, Héctor M. Figueroa-Torres and Miguel Mejías Cruz, were posted in line circling the premises of the capitol in order to prevent the entrance of the general public to the Capitol building. (Id. at ¶¶ 3.5-3.6)

Plaintiffs arrived at the scene around 4:30 p.m., and joined other protesters and organizations placing themselves at the North Plaza of the Capitol Building, a traditional public forum on which for many years organizations and individuals have gathered to exercise their First Amendment Right of expression. (Id.)[1] Around 6:45 p.m., while the plaintiffs were peacefully participating in the event, Police Officer 1 approached the demonstrators and with a megaphone advised them to move. (Id. at ¶ 3.5) All of a sudden and without any opportunity to negotiate or to dialogue, the Police Officers from the Tactical Operation Division charged against the protesters, including plaintiffs. (Id. at ¶ 3.6) Without any legal justification the Police Officers from the Tactical Operation Division, identified in the complaint as Agents 1 thru 10, and Agent Sanchez [2] indiscriminately assaulted the plaintiffs by using their batons, tear gas and peppers spray. Plaintiffs in particular were brutally clubbed, tear gassed and peppers sprayed by several field officers, including agent Sanchez.( Id. at ¶¶ 3.7-3.11)

As a consequence of this wanton and unabashed display of violence and excessive force, plaintiffs suffered severe physical damages and mental anguishes. (Id. at ¶¶ 3.12, 3.13, 3.24) Also, the deployment of this unlawful use

---

[1] As alleged in the Amended Complaint, the Plaza has been used for gatherings and protests by political and labor organizations, environmental groups, religious congregations (such as "Clamor a Dios", which holds an annual gathering), and other groups from civil society. (See Docket Doc 4 at ¶ 3.4

[2] Agent Sánchez has been identified as Agent Luis Sánchez-Meléndez (See Docket Doc. 27)

of excessive force had the effect of suppressing plaintiffs' right to participate in peaceful assembly and protest activity, all in violation of their First, Fourth, Fifth, Ninth, Tenth and Fourteenth Amendment Rights under the Constitution of the United States. (Id. at ¶3.29)   Figueroa-Sancha, José Rosa Carrasquillo, Leovigildo Vazquez, Héctor M. Figueroa-Torres and Miguel Mejías Cruz were present at the scene during the incident upon which plaintiffs base their cause of action under Section 1983. (Id. at ¶3.5, 3.14, 3.15)  In fact, from the place of the event the former Chief of Police, Figueroa-Sancha, made a public statement to the press in which he expressed that from early in the morning he personally had given instructions that ultimately lead to the aggression to the plaintiffs. (Id. at ¶3.14) Tellingly defendants strain to avoid mentioning these well-pled facts to the Court. José Rosa Carrasquillo, Leovigildo Vazquez, Héctor M. Figueroa-Torres and Miguel Mejías Cruz were also present at the event, under the direct command of Figueroa Sancha.  Blindly following Figueroa Sancha's instructions and orders, José Rosa Carrasquillo, Leovigildo Vazquez, Héctor M. Figueroa-Torres and Miguel Mejías Cruz, by their own acts and omissions, actively encouraged, permitted and overlooked the behavior of the police officers under their command, including Agent Sánchez, that directly resulted in the aggression of the plaintiffs. (Id. at ¶¶ 3.5, 3.14, 3.15). They also failed to establish a perimeter in order to protect the demonstrator and to ensure the peaceful exercise of their Constitutional Rights. (Id.)[3]

---

[3] At ¶ 3.14 of the complaint, plaintiffs specifically allege that Defendant Figueroa-Sancha publicly admitted that he had been from the very beginning at the Capitol Building and that all actions taken by the Police were under his direct and express authorization. In fact, Defendant Figueroa-Sancha ordered the Tactical Unit and the Special Tactical Unit to line up inside the Capitol building well before the demonstrators

Immediately after the incident, the Governor of Puerto Rico, Luis Fortuño Burset, instructed Figueroa-Sancha to investigate any possible incident of police misconduct during the vent, specifically the aggression against the plaintiffs. However, as far as plaintiffs concern, no investigation has been carried out and therefore no disciplinary measure for police misconduct has been imposed against the police officers involved. (Id. at 3.22) Besides asserting a direct claim for defendants own action and omissions the complaint also avert that the Supervisory defendants were well aware of the pervasive culture of violence within the police department and the profound problems the areas of police accountability, recruitment, training, discipline and supervision within the Department. However, with deliberate indifference they have willfully failed to take effectives remedial steps, and in failing to doing so they have perpetuate, encourage and condoned the structural problem of police abuse that ultimately lead to the violation of plaintiffs' constitutional rights. (Id. at ¶¶ 3.16, 3.17, 3.18 3.20, 3.21, 3.23, 3.24 3.26, 4.3)

## II.     RULE 12 (b)(6) LEGAL STANDARD

In assessing whether dismissal for failure to state a claim is appropriate, the court must take "plaintiffs' well-pleaded facts as true and [indulge] all reasonable inferences therefrom to their behoof." Buck v. American Airlines, Inc., 476 F.3d 29, 32 (1st Cir.2007). Thus, when examining the complaint in the face of a motion to dismiss such as the one presented by defendants at bar, all well

---

arrived, in violation of the police regulations which establish that these units should be activated only when public safety is in jeopardy. Further, the Special Tactical Unit must be activated, if the Tactical Unit cannot contain the situation. Defendant Héctor M. Figueroa, as Commander of the Tactical Unit violated these regulations, which ultimately was the proximate cause to plaintiffs' violation of civil rights. Defendant John Doe, as Commander of the Specialized Unit violated these regulations, which ultimately was the proximate cause to plaintiffs' violation of civil rights.

pleaded allegations must be taken as true, the Court must resolve all doubts and inferences in the plaintiffs' favor, and must view the pleading in the light most favorable to them. Negrón-Gaztambide v. Hernández Torres, 35 F.3d 25, 27 (1st Cir. 1994); Wyss v. General Dynamics Corp., 24 F. Supp. 2d 202, 203 (D.R.I. 1998). In civil rights actions, pursuant to Fed.R.Cv.P. 12(b)(6) the Court "may dismiss a complaint only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations." Educadores Puertorriqueños en Accion v. Hernandez, 367 F.3d 61, 66 (1st Cir.2004)

Ordinarily, a court may not consider any documents that are outside of the complaint, or not expressly incorporated therein, unless the motion is converted into one for summary judgment. Watterson v. Page, 987 F.2d 1, 3 (1st Cir.1993) There is, however, a narrow exception "for documents the authenticity of which are not disputed by the parties; for official public records; for documents central to plaintiffs' claim; or for documents sufficiently referred to in the complaint." Id. When the complaint relies upon a document, whose authenticity is not challenged, such a document "merges into the pleadings" and the court may properly consider it under a Rule 12(b)(6) motion to dismiss. Beddall v. State St. Bank & Trust Co.,137 F.3d 12, 16 (1st Cir.1998); accord Clorox Co. P.R. v. Proctor & Gamble Commercial Co., 228 F.3d 24, 32 (1st Cir.2000) (considering advertising material outside of the complaint in a motion to dismiss false advertising claim because material was "integral" to assessing the complaint's allegations).[4]

---

[4] To support their arguments, plaintiffs attached with this motion two documents: Complaint Q2010-01-03-151, prepared by the Administrative Investigations Division of the PRPD (Attachment 1); and

## III.      SUPERVISORY LIABILITY PLEADING STANDARD UNDER SECTION 1983

When confronted with a motion to dismiss under Fed.R.Cv.P. 12(b)(6) the District Court must bear in mind that the pleading requirements established under Fed.R.Cv.P. 8(a)(2) are minimal. The Rule mandates that every complaint must contain "a short plain statement of the claim showing that the pleader is entitle to e relief" Bell Atlantic Corp. v. Towmbly, 550 U.S. 544, 555 (2007). Such "short and plain statement" does not need detailed factual allegations. Id.  It only requires sufficient detail in the complaint to give a defendant fair notice of the claim and the grounds upon it rests. Id. (citing Conley v. Gibson, 355 U.S. 41 47 (1957).

However, certainly Rule 8(a)(2) requires that the factual allegations in the complaint surpass mere "labels and conclusions" or "formulaic recitation of the elements of a cause of action¨. Id. Pursuant to Twombly, the factual allegations must be enough "to raise a right to relief above the speculative level on the assumption that all the allegations in the complaint are true (even if doubtful in fact)¨. Id., at 555; Ocasio-Hernández v. Fortuño Burset, 640 F.3rd 1, 8 (2011) However, as the 1st Circuit noted in Ocasio,  Towmbly does not require the plaintiffs to elicit "a heightened fact pleading of specific, but only enough facts to state a claim to relief that is plausible on its face". Towmbly, at 570; Ocasio, supra at 8.

In Ashcroft v. Iqbal, 129 S.Ct. 1937 (2009), The Supreme Court extended the pleading standard articulated in Towmbly in supervisory liability claims

Investigation of the Puerto Rico Police Department (Attachment 2) prepared by the Civil Rights Division of the U. S. Department of Justice. Both are official public documents central to plaintiffs' claim.

brought under a <u>Bivens</u>,[5] and established a two-prong approached implicit in the <u>Towmbly</u> decision. <u>Iqbal</u> at 1949. *See also* <u>Ocasio-Hernández v. Fortuño Burset</u> at 10-11. Accordingly, a Rule 12(b)(6) motion to dismiss should begin by separating a complaints factual allegations from its legal conclusions. <u>Iqbal</u> 1949-50; <u>Ocasio</u>, 10. Next, after disregarding the legal conclusions, <u>Iqbal</u> and <u>Towmbly</u> require that the trial Court accepts as true the remaining allegations and taken as a whole establishes a plausible legal claim allowing the court to draw the reasonable inference that the defendant is liable for the alleged misconduct. <u>Id.</u> Hence, the pleadings specificity requirement in civil rights complaints, as discussed in <u>Iqbal</u> and <u>Towmbly</u>, is nothing new for the 1st Circuit. As the appellate court has pointed out, "<u>Iqbal</u> could be viewed as emergent law (omitted citations), but [the 1st Circuit] had earlier said a complaint that rest on 'bald assertions' and 'unsuportable' conclusions may be subject to dismissal. <u>Peñalbert-Rosa v. Fortuño-Burset,</u> 631 F.3rd 592, 595 (2011).

As discussed in detail in the following section, with regard to the cause of action against supervisors *per se*, it is incorrect to sustain that <u>Iqbal</u> ruling has the effect to abolish the long established doctrine of Supervisory Liability under Section 1983. What <u>Iqbal</u> stresses is that Supervisory Liability cannot be based merely on supervisor's knowledge of illegal conduct, since no *respondeat superior* liability is allowed in <u>Bivens</u> claims. Absent vicarious liability, each government official is only liable for his or her own misconduct. <u>Iqbal</u> at 1948-49. Hence, in order to sustain a valid claim of supervisory liability the complaint must has plausibly articulated, above the speculative level, an affirmative link between

---

[5] <u>Bivens v. Six Unknown Named Agents,</u> 403 U.S. 388 (1971)

the behavior of the subordinated and the action or inaction of his supervisor such that the supervisor's conduct led inexorably to the constitutional violation. Maldonado v. Fontanes, 568 F.3rd, 263, 275 (2009)(quoting Pineda v. Toomey, 533 F3rd 50, 54 (1st Cir. 2008) See also Soto Torres v. Fraticelli, 654 F3rd 153, 158; Aponte Matos v. Toledo Dávila, 135 F.3d 182, 192 (1st Cir.1998); Maldonado-Denis v. Castillo-Rodriguez, 23 F.3d 576, 581 (1st Cir.1994) Gutierrez-Rodriguez v. Cartagena, 882 F.2d 553, 561 (1st Cir.1989). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Iqbal, 129 S.Ct. at 1949.

After Iqbal, the 1st Circuit has sustained that in the context of Section 1983 actions, supervisory liability typically arises in either two ways. First, when the supervisor is the "primary violator or direct participant in the rights-violating incident". Sanchez v. Pereira-Castillo, 590 F.3rd 31, 49 (2009).[6] Second, liability also arises "if a responsible official supervises, trains, or hires a subordinate with deliberate indifference toward the possibility that deficient performance of the task eventually may contribute to a civil rights deprivation." Id. (quoting Camilo-

---

[6] While the 1st Circuit in Sanchez v. Pereira-Castillo, 590 F.3d 31, explained that supervisory liability can still arise as a cause of action in the wake of Iqbal, it should be noted that the supervisors in that case were not found to be liable. However, the facts there and those in the case at bar are demonstrably different so that the ruling in Sanchez does not preclude a finding of supervisory liability here. In Sanchez, it was important that the supervisors in question were not present during the alleged constitutional violation. The Court there ruled that plaintiffs' statements as to the lack of training and lack of proper regulations and directives were not enough, by themselves, to prevent dismissal of the claim. 590 F.3d at 49-50. In this case, on the other hand, all five supervisor defendants were present at the scene and either gave orders to or failed to stop Tactical Operation Division police officers from charging the protestors and attacking the plaintiffs. This factual scenario comes on top of the defendants' failure to provide training and establish protocols for the use of force, in spite the Governor of Puerto Rico's external committee's recommendations to do so dating back to 2007.

Robles v. Zapata, 175 F.3d 41, 44 (1st Cir.1999)).  In this scenario, the analysis focuses on "whether the supervisor's actions displayed deliberate indifference toward the rights of third parties and had some causal connection to the subsequent tort." Zapata at 44. In either case, the plaintiff in a Section 1983 action must show "an affirmative link, whether through direct participation or through conduct that amounts to condonation or tacit authorization," Id., between the actor and the underlying violation. Id. See also Sánchez v. Pereira –Castillo, 590 F.3rd. 31, 49 (2009).

Hence, "[e]ven if a supervisor lacks actual knowledge of censurable conduct, he may be liable for the foreseeable consequences of such conduct if he would have known of it but for his deliberate indifference or willful blindness, and if he had the power and authority to alleviate it." Maldonado-Denis, 23 F.3d at 582. The "causation requirement can be satisfied even if the supervisor did not participate directly in the conduct that violated a citizen's rights ... if the supervisor knew of, overtly or tacitly approved of, or purposely disregarded the conduct." Rodríguez Vázquez v. Cintrón, 160 F.Supp. 22nd 204, 211(D.P.R.2001), citing, Lipsett v. Univestiy of Puerto Rico, 864 F.2d 881, 902-903 (1st Cir.1988).

The necessary nexus may be found also if "there exists a widespread abuse sufficient to alert a supervisor to ongoing violations [, to the extent that] the supervisory is on notice and fails to take corrective action, say, by better training or closer oversight." Maldonado-Denis, 23 F.3d at 582. See also Barreto-Rivera v. Medina Vargas, 168 F.3rd 42 (1st. Cir. 1999) (Extensive record of physical

abuse of a police officer is sufficient to allow a jury to reasonably conclude that Superintendent Toledo Dávila displayed deliberate indifference to the officer's propensity toward violent conduct and that there was a causal connection between this deliberate indifference and the officer's conduct). Finally, reckless and callous indifference can be established when the supervisor knows or should have known that there are problems in the training and recruitment practices that are harmful to the rights of the citizens, and the supervisor willfully ignores those problems. See <u>Febus-Rodríguez v.Betancourt Lebrón</u>, 14 F 3rd 87 (1st Cir. 1994)

Accordingly, this Honorable Court has previously recognized a plausible Section 1983 cause of action cause of action under the theory of supervisory liability, applying <u>Iqbal</u>/<u>Towmbly</u> pleading standard. In <u>Rivera v. Toledo</u>, 2010 WL 2636028 (DPR 2010)(Casellas, J.), plaintiffs sued several high ranking officials, including Pedro Toledo as former chief of police, for their deliberate indifference and disregard to the problem of pattern and practice of police abuse within the Villa Cañona Community in Loíza, which resulted in the unlawful aggression of three of its residents in three different occasions. As in this case, supervisory defendants moved to dismiss based on <u>Iqbal</u>. On reconsideration and after evaluating the transcripts of the depositions taken to the defendants pending the resolution of the motion to dismiss, this Court reinstated the cause of action against the supervisory defendants although they did not directly participated in the aggression. This Court reasoned "[t]he depositions appear to contradict Defendants' prior theory that Toledo and Matos were not familiar with

the events occurring in Villa Cañona. Furthermore, their acknowledgment of at minimum tangential knowledge of risks of constitutional violations clearly suggests that Plaintiffs' case for supervisory liability is more than merely speculative. This matter is far from resolved, but must be reserved for summary judgment pleadings or trial." Id.

## V.    TWOMBLY/IQBAL TWO PRONG APPROACH APPLIED TO PLAINTIFFS' CLAIM.

Nowhere in their lengthy motion to dismiss defendants confronts plaintiffs' compliant with the two prong assessment articulated in Iqbal and Twombly, as outline by the First Circuit in Ocasio. In their motion, supervisory defendants basically spilled out the pleading standard case law under Iqbal, without making a profound individual assessment of the pleadings in the complaint. This is because clearly the pleadings as drafted successfully incorporates as to each supervisory defendant factual allegations that, after drawing all reasonable inferences in favor of the plaintiffs, raise a right to relief above the speculative level on the assumption that all the allegations in the complaint are true. Towmbly.

### Factual Allegations against Figueroa-Sancha.

By June 30th 2010, defendant Figueroa Sancha was the Superintendent of the Puerto Rico Police Department, and as such he was responsible for the execution of the laws and regulations of the commonwealth of Puerto Rico pertaining to law enforcement. As the person occupying the highest position within the Puerto Rico Police Department, he is also responsible for adequate training, supervision and discipline of all the employees and officers under his

command, including all the supervisory defendants and agent Sanchez. (See 1st Amended Complaint, ¶ 2.3)

Figueroa Sancha was present at the site when the event of aggression against the plaintiffs occurred. By his own account, he arrived at the scene from the very beginning of the event, and he personally gave instructions and orders to the officers under his command, unlawfully allowing and encouraging by his express authorization the abusive police conduct which resulted in the violation of plaintiffs' constitutional rights. (See 1st Amended Complaint ¶¶ 3.14 and 3.15).[7] The unidentified Police Officer 1 and Agent Sanchez unleashed an unfettered and vicious attack upon the protesters, including plaintiffs, blindly following the orders of the supervisory defendants, including Figueroa-Sancha. (See 1st Amended Complaint ¶¶ 3.10, 3.14, 3.15)

Just after the incident, the Governor of Puerto Rico personally instructed Figueroa Sancha to carry out an investigation of the events of Police Abuse that took place on June 30th 2010. (See 1st Amended Complaint ¶ 3.22) Although plaintiffs were victims of an atrocious act of police abuse, no investigation was carried out, and hence, no disciplinary measure was imposed to those agents responsible for plaintiffs' aggression. (See 1st Amended Complaint ¶ 3.22 and 3.23) This unlawful disregard to effectively follow up complaints and to initiates investigations of police abuse "have led to a culture of impunity within the police force that ultimately encourages and stimulates police abuse and violence such as the incident narrated in the complaint"   (See First Amended Complaint ¶¶

---

[7] This allegation can be corroborated through *YouTube* web service at
http://www.youtube.com/watch?v=MGXKuEqvp8U

3.20, 3.21) This is evident taking into account that during the event Figueroa-Sancha (as well as the other Supervisory defendants) allowed the participation in the operation of a  police officer identified as Lieutenant Vargas who unlawfully upholstered his pistol and fired several rounds. This officer by the time of the incident had twenty five administrative claims filed against him, and still was on active duty during the event. (See Amended Complaint ¶ 3.16)

The wanton display of excessive force against the plaintiffs and other protesters, as narrated in detail in the complaint speaks for itself. It reveals the absolute lack of adequate training within the police with regard to the proper policies on the use of physical force, the use of batons, the use of CN Gas, the use of pepper spray, crowd control techniques and the establishment of a perimeter  (See 1st Amended Complaint ¶¶  3.1 through 3.13, 3.15, 3.18, 3.19 ). By the same token, the chaotic and violent environment created by the police against peaceful protesters clearly reveals Figueroa Sancha's (as well as the other supervisory defendants') unlawful failure to protect the protesters (See 1st Amended Complaint ¶  3.15)  and his failure to conduct proper screening in the selection process of police officers involved.(Id,)

**Factual Allegations against Rosa Carrasquillo, Leovigildo Vazquez, Mejias Cruz and Figueroa-Torres**

By the time of the event José Rosa Carrasquillo was the Auxiliary Superintendent. Leovigildo Vazquez was the Auxiliary Superintendent of Field operation. Héctor Figueroa Torres was the Commanding Officer of the Tactical Operations Unit. Miguel Mejias–Cruz was the Regional Director of San Juan. (See 1st Amended Complaint ¶¶  2.4,   2.5, 2.6, 2.7) In the complaint it is

specifically averred at ¶ 3.15 that this co-defendants' own misconduct and omissions consisted in blindly following Figueroa Sancha's orders and:

> (1) allow all the officers to illegally hit demonstrators with their batons in areas over their shoulders (raising their batons over their helmets), to allow these officers to (2) viciously attack members of the press and defenseless persons, such as plaintiffs and other demonstrators, to (3) allow Officers 1 thru 5 the unreasonable and unwarranted use of pepper spray upon the demonstrators, particularly on plaintiffs, to (4) allow Officers 6 thru 10 the unreasonable and unwarranted use of tear gas upon the demonstrators, particularly on plaintiffs, (5) to fail in their screening and monitoring by improperly allowing officers such as Lieutenant Juan D. Vargas to participate in this operation, an officer with twenty-five administrative claims filed against him, who unholstered his gun and fired several rounds, and (6) to improperly allow officers to partake in these operations without visible identification with absolute impunity, were the proximate cause of the complete havoc and disarray caused by the police, which resulted in violation of plaintiff's constitutional rights".

(Docket Doc. 4 at ¶ 3.15) As Figueroa–Sancha, all of them had the duty to supervise, evaluate, monitor assign and discipline the police officers under their command, specifically defendant agent Sanchez and Officers1 thru 10. (Docket Doc. 4 at ¶¶ 2.4-2.7)

On June 30th, 2010, they were at the scene, blindly following Figueroa Sancha's unlawful instructions and orders, or directing the officers under their command or allowing them to perpetrate in their presence the unlawful display of excessive force that resulted in the violation of plaintiffs' constitutional rights as meticulously articulated in the complaint. (See 1st Amended Complaint ¶¶ 3.5, 3.15)

In the complaint it is specifically alleged that before the June 30th incident all the supervisory defendants were well aware of the of the pattern of civil rights violations within the Puerto Rico Police department, which include delay in resolving the excessive force complaint, absence of directives, policies and protocols with regard to crowd control and flaws in the disciplinary process as revealed by an investigation conducted by the American Civil Liberties Union and a report prepared by a committee of el Colegio de Abogados. (See Amended Complaint ¶¶ 3.16-3.20) (See e.g. Rivera v. Toledo, supra.) However, the supervisory defendants, even though they were put on notice of the pattern of civil rights violations and the problems in the investigation and disciplinary process, failed to implement the recommendations and measures to correct the culture of violence within the police force in order to prevent incidents of police abuse like the one narrated in the complaint. (See Amended Complaint ¶ 3.18, 3.21) (See e.g. Rivera v. Toledo, supra.)

In fact, recently plaintiffs learn through the press that the Puerto Rico Police Department made an internal investigation of the June 30th incident, performed by Lt. Raymond Ferrer Silva, Director of the Administrative Investigations for the San Juan Region of the PRPD.[8] After scrutinizing the conduct of co-defendants Mejias and Figueroa, in the investigation report in is concluded that they incurred in egregious violations, demonstrating manifest

---

[8] On March 9th 2012, reporter Oscar Serrano published an article in Noti-Cel online news service mentioning that in the parallel case of Hiskes v. Figueroa Sancha ( Civ. No 10-2246 (JAG)) it was under discussion a discovery request of an internal police report which concludes that the supervisory defendants were responsible of the police excessive force perpetrated against the protesters during the June 30th event. According to the news clip, the PRPD was improperly withholding the production of the document to the plaintiffs' attorney of that case. The report, corresponding to "Complaint #Q2010-01-03-151" is now part of the judicial record in that case (See Docket 92). In the case at bar plaintiffs have includes as attachment 1 the pertinent part of the report.

incapacity, ineptitude, carelessness, bias or negligence in the performance of his duties, functions and responsibilities. (See **Attachment 1**: Complaint #Q2010-01-03-151, at pages 26 and 27). In the report, it is confirmed that that Codefendant Mejías was following Figueroa Sancha's and Leovigildo Vázquez' instructions, that Figueroa Sancha was personally directing the operation and that by the time the police officers made use of the CN gas against the protester the highest ranking official near them was Codefendant Figueroa. (Id. at page 3 of the report). It is further confirmed that Co-defendant Mejías, under the direct supervision of Figueroa Sancha, took over the situation after alleged attempts to negotiate with the protesters renders no results. (id. at page 5.)

The complaint as drafted, surpasses by far the mere assertion of conclusory statements, and articulates a plausible liability cause of action by establishing with enough facts defendants' direct and personal participation in the violation of plaintiffs' constitutional rights and their deliberate indifference in the supervision, training, or hiring of their subordinates. Plaintiffs' allegations are well sustained by the Figueroa Sancha's own accounts with regard to his personal and direct supervision during the event, and the internal investigation of the PRPD which corroborates plaintiffs' allegations (See **Attachment 1**).

Illustrative to this point is the decision of Eleventh Circuit of the U.S. Court of Appeals in Keating v. City of Miami, 598 F.3rd 753 (2010). The Court of Appeals addressed a remarkably similar set of facts as those presented here by the plaintiffs when a group of protester brought a Section 1983 action against municipal defendants and individual supervisor police officers alleging violations

of their First, Fourth and Fourteenth Amendments rights. As in the case at bar, in Keating it was alleged that the supervisory police officers, including the Chief of Police, the Deputy Chief of Police and a Police Captain, violated plaintiffs rights under the theory of supervisory liability when they directed their subordinate officer to unlawfully disperse a peaceful protest by "herding" the demonstrators, using their batons to beat unarmed demonstrators, spraying pepper spray up an down the police line discharging bean bags, pepper spray balls, tear gas and other projectiles. Id. at 758.

With regard to the supervisory defendants it was specifically alleged that, as in the case at bar, the supervisory defendants were all authorized decision makers present on the scene where the demonstration occurred. Id at 763-764. According to the complaint the Chief of Police approved orders permitting the police line to advance while beating unarmed demonstrators and discharging projectiles and tear gas. Id. It is also alleged that the Deputy Chief made the decision to utilize "herding techniques" to corral the demonstrator by personally directing the police lines to march northward and to discharge weapons at the protesters. Id. It is further alleged that the supervisory defendants failed to stop the unlawful act of their subordinates having the authority to do so. Id. (Compare with Docket Doc. 4, First Amended Complaint, ¶3.15)

Not surprisingly, as in the case at bar the Keating supervisory defendants moved to dismiss on qualified immunity grounds, and relying on Iqbal they argued that the complaint as drafted did not satisfy the heightened pleading standard for Section 1983 actions. Id. The Court of Appeals rejected the

supervisors' argument. The appellate panel concluded that the plaintiffs satisfied the pleading requirement for a Section 1983 claim under the supervisory liability theory by alleging a causal connection established by facts that support an inference "that the supervisory defendants directed the subordinate officers to act unlawfully" and that "their commands caused the subordinate police officers to disperse a crowd of peaceful demonstrators" in violation of their First Amendment Rights. Id. at 764. Also, in order to sustain claims against the supervisors, the Court of Appeals deemed enough that the allegation establishes that the supervisors had the authority to direct the subordinate officers to engage in unlawful violation and also the authority to stop them from exercising unlawful conducts. As in Keating, in the case at bar the complaint establishes that the defendants were present and had the direct control and authority over the operation and the field officers.

To sum up, the complaint as drafted certainly includes enough details to provide the defendants with fair notice of the nature of the claim so it may effectively defend against it, and it is sufficiently plausible as to justify subjecting the defendants to discovery. See, e.g., Starr v.Baca, 633 F.3d 1212 at 1218-1219 (9th Cir. 2011).

## VI.    QUALIFIED IMMUNITY

In their Motion to Dismiss, the supervisory defendants sustain that for purposes of the Qualified Immunity analysis plaintiffs failed to defined with sufficient level of specificity that the constitutional rights allegedly violated was clearly established (Docket 26,  at page 30). Also they bluntly conclude that after

Iqbal it is impossible for plaintiffs to establish that the supervisory defendants could violate any Constitutional Rights. In other words, from their point of view since Iqbal had the effect to abolish Supervisory Liability under Section 1983, plaintiffs have failed to allege a violation of a clearly established right. (Docket 26, at pages 32-35) Nothing could be further from the truth.

In general, qualified immunity "provides defendant public officials an immunity from suit and not a mere defense to liability." Maldonado, 568 F.3d at 268. The defendants are entitled to qualified immunity unless (1) "the facts alleged or shown by the plaintiff make out a violation of a constitutional right" and (2) such right was " 'clearly established' at the time of the defendant[s'] alleged violation[s]." Id. at 269 (quoting Pearson v. Callahan, 555 U.S. 223 (2009)). "A right is clearly established only if 'it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted.'" Soto–Torres v. Fraticelli, 654 F.3d 153, 158 (1st Cir.2011) (quoting Brosseau v. Haugen, 543 U.S. 194, 199 (2004)).

The first prong of the immunity analysis requires that a plaintiff state a claim of violation of a constitutional right. Maldonado v. Fontanes, 568 F.3d 263, 269 (1st Cir.2009).  As already discussed in this motion, in determining whether such a claim has been stated under Iqbal, a court must accept as true all of the allegations contained in a complaint setting aside legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice. Iqbal. "Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.' "Id. (quoting

Twombly, 550 U.S. at 557). Second, "only a complaint that states a plausible claim for relief survives a motion to dismiss." Id. Determining whether a complaint states a plausible claim for relief is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." Id. "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show [n]'—'that the pleader is entitled to relief.' "Id. (second alteration in original) (quoting Fed.R.Civ.P. 8(a)(2)).

Though certainly Iqbal spurred a great deal of discussion among the courts about the new applicable pleading standard under 1983, nothing in the decision suggests that the long standing doctrine of supervisory liability under Section 1983 was eliminated. See e.g. Dodds v. Richardson, 614 F3rd 1185, 1200 (10th Cir. 2010) (While Iqbal may very well have abrogated § 1983 supervisory liability as we previously understood it in this circuit in ways we do not need to address to resolve this case, we do not believe it altered the Supreme Court's previously enunciated §1983 causation and personal involvement analysis). In Iqbal Federal officials arrested and detained the plaintiff, a Pakistani citizen, in the United States shortly after the September 11, 2001 terrorist attack. Iqbal filed a Bivens claim in which he alleged that John Ashcroft, the former Attorney General, and Robert Mueller, the Director of the Federal Bureau of Investigation (FBI), violated his equal protection rights. Id. at 1942–43. Specifically he alleged that his detention was motivated on account of race, religion and national origin, and that Ashcroft and Mueller "knew of,

condoned, and willfully and maliciously agreed to subject" plaintiff to harsh condition of confinement solely on account of his religion race and/or national origin. Id. The Supreme Court, after a profound discussion of the applicable pleading standard (see above), as applied to the specific context of that case, was careful enough as to clarify that "[t]he factors necessary to establish a Bivens violation" and presumably a § 1983 violation, "will vary with the constitutional provision at issue." Id. Hence, when a plaintiff alleges invidious discrimination in contravention to the Constitution he or she "must plead and prove that the defendant acted with discriminatory purpose." Id. In the specific context presented in Iqbal, plaintiff had to plead that Ashcroft and Mueller "adopted and implemented the ... policies at issue not for a neutral ... investigative reason but for the purpose of discriminating on account of race, religion, or national origin." Id. at 1948–49.

Different to Iqbal, the case at bar does not involve discriminatory federal investigatory policies regarding national security or terrorist threat. Nor in this case it is alleged Equal Protection violations on account of race, religion or national origin. Here it is plausibly alleged with enough supportive facts that the defendants personally participated in, and personally directed, a violent and unlawful operation against a group of peaceful protesters that resulted in violation of plaintiffs' 1st, 4th, 5th and 14th Amendments of the Constitution. Pursuant to the complaint, the police operation the defendants personally directed went infinitively astray from proper police procedures and protocols with regard to crowd control. The averments mention the personal participation of each

defendant in the direction and oversight of the operation that resulted in plaintiffs aggression; the absolute lack of interest to investigate the officers responsible of the unlawful aggression against the plaintiffs; their complete disregard to the security of citizens when they allowed that officers with vast history of administrative complaints participated in the operation; their deliberate indifference and willful blindness in correcting police policies with regard to structural problems such as training, recruitment and crowd control policies, even though they have been put on notice of such problems. (See Docket Doc. 4 ¶3.15). (Compare with <u>Keating v. City of Miami</u>, <u>supra)</u>

In sum, as discussed in a previous section of this motion, following <u>Iqbal</u> the 1st Circuit has recognized right of plaintiffs to sue a supervisor under Section 1983 when the supervisor is the "primary violator or direct participant in the rights-violating incident" and "if a responsible official supervises, trains, or hires a subordinate with deliberate indifference toward the possibility that deficient performance of the task eventually may contribute to a civil rights deprivation." . <u>Sanchez v. Pereira-Castillo</u>, 590 F.3rd 31, 49 (2009). See also <u>Rivera v. Toledo</u>, <u>supra.</u>

Having established the contours of the supervisory liability after <u>Iqbal</u>, as recognized by the First Circuit, only rest to discussed whether in the complaint have successfully elicit the violations of constitutional rights and whether those rights where clearly established.

## A.  PLAINTIFFS FIRST AMENDMENT CLAIM

Defendants argue that plaintiffs failed to establish factual allegations that sustain a cause of action under the First Amendment of the Constitution noting that in the complaint it was not specified whether the parking lot at the right of the Capitol Building, constitutes a public forum historically associated with the exercise of expressive ideas. (Docket 26, page 35). With this assertion defendants have brought into discussion an issue of facts with regard to the public nature of the space the plaintiffs were occupying during the event. The stage of the proceedings is not proper for such determination. According to the pleading standard it is enough that this Honorable Court takes as true the allegations of the complaint. *See* <u>Towmbly</u>, <u>supra.</u> Clearly in the complaint it is alleged that that the demonstration in which the plaintiffs participated took place at the north Plaza of the Capitol Building, which is a recognized traditional public forum. (Docket 4, ¶ 3.4)

However, for purposes of this discussion, it is enough to establish that the area by the parking lot, as well as other premises surrounding the Capitol Hill, is a public property that constitutes an integrated extension of the North Plaza immediately adjacent to it. As integral part of the Plaza, has also been a traditional place for gatherings and manifestations of different groups. In fact, as it is specifically alleged in the complaint, previous to the assault the police officers from the Tactical Division were standing in line just in front of the protesters in order to prevent them to get access to the Capitol premises. Naturally, the protester would have not choice but to occupy other public area

adjacent to the Plaza, since they were denied reasonable alternatives to exercise their right to expression.

The First Amendment declares that "Congress shall make no law ... abridging the freedom of speech ... or the right of the people peaceably to assemble." The Amendment embodies and encourages our national commitment to "robust political debate," Hustler Magazine v. Falwell, 485 U.S. 46, 51, (1988), by protecting both free speech and associational rights. NAACP v. Alabama ex rel. Patterson, 357 U.S. 449, 460–61, 78 S.Ct. 1163, 2 L.Ed.2d 1488 (1958) (freedom of association); De Jonge v. Oregon, 299 U.S. 353, 364, 57 S.Ct. 255, 81 L.Ed. 278 (1937) ("The right of peaceable assembly is a right cognate to ... free speech and ... is equally fundamental.").

The vitality of civil and political institutions in our society depends on free discussion. Terminiello v. City of Chicago, 337 U.S. 1, 4(1949).

> [A] function of free speech under our system of government is to invite dispute. It may indeed best serve its high purpose when it induces a condition of unrest, creates dissatisfaction with conditions as they are, or even stirs people to anger. Speech is often provocative and challenging. It may strike at prejudices and preconceptions and have profound unsettling effects as it presses for acceptance of an idea. That is why freedom of speech, though not absolute, [citations omitted], is nevertheless protected against censorship or punishment, unless shown likely to produce a clear and present danger of a serious substantive evil that rises far above public inconvenience, annoyance, or unrest. [citations omitted]. There is no room under our Constitution for a more restrictive view. For the alternative would lead to standardization of ideas either by legislatures, courts, or dominant political or community groups.

Id.

The Supreme Court has declared that the First Amendment protects political demonstrations and protests, activities at the heart of what the Bill of Rights was designed to safeguard. Boos v. Barry, 485 U.S. 312, 318 (1988). Political protest speech is protected even though it invites dispute and may stir people to anger. Terminiello, supra; Edwards v. South Carolina, 372 U.S. 229, 237(1963). Plaintiffs recognize that in some limited instances the police may properly limit the exercise of free speech where necessary for the safety and protection of protestors and the community. Cantwell v. Connecticut, 310 U.S. 296, 304 (1940). However, protestors have a First Amendment Right to be heard without unreasonable police interference. Amnesty Intern., USA v. Battle, 559 F.3d 1170 (2009, 11th Cir). Indeed, the Supreme Court has repeatedly held that police may not interfere with orderly, nonviolent protests merely because they disagree with the content of the speech or because they simply fear possible disorder. Cox v. Louisiana, 379 U.S. 536, 550-551 (1965); Watson v. City of Memphis, 373 U.S. 526, 535, (1965)

Government officials are authorized to stop or disperse public demonstrations or protests only where "clear and present danger of riot, disorder, interference with traffic upon the public streets, or other immediate threat to public safety, peace, or order, appears." Cantwell v. Connecticut, 310 U.S. 296, 308 (1940). Absent imminent harm, police officers can not simply disperse protesters without giving a fair warning and time to comply with the dispersal order. Papineau v. Parmley, 465 F.3rd 46, 60 (2006)

Since marches and other protest activities clearly constitute protected speech, it has been long recognized that a proper venue for them to take place are public forums. Shuttlesworth v. City of Birmingham, 394 U.S. 147, 152 (1969)(describing the privilege of citizens to assemble, parade, and discuss public questions in streets and parks). Public forums are those open spaces—streets, parks, and sidewalks—to which the public generally has unconditional access and which "have immemorially been held in trust for the use of the public and, time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions." Hague v. Committee for Industrial Organizations, 307 U.S. 496, 515 (1939);United States v. Grace, 461 U.S. 171, 177 (1983); Perry Educ. Ass'n, 460 U.S. at 45, 103 S.Ct. 948. It has been specifically held that the grounds of a state capitol, is an appropriate site for peaceful protest. Edwards v. South Carolina 372 U.S. 229 (1963) (Holding that arrest, conviction and punishment of group of African-Americans for breach of the peace by marching peacefully on sidewalk around State House grounds to publicize their dissatisfaction with racially based discriminatory actions infringed their constitutionally protected rights of free speech, free assembly, and freedom to petition for redress of their grievances).

In places which by long tradition or by government fiat have been devoted to assembly and debate, the rights of the state to limit expressive activity are sharply circumscribed. At one end of the spectrum are streets and parks which "have immemorially been held in trust for the use of the public, and, time out of mind, have been used for purposes of assembly, communicating thoughts

between citizens, and discussing public questions." Perry Educ. Ass'n v. Perry Local Educators' Ass'n, 460 U.S. 37, at 45 (1983) (quoting Hague v. CIO, 307 U.S. 496, 515 (1939)). In these quintessential public forums, the government may not prohibit all communicative activity. For the state to enforce a content based exclusion it must show that its regulation is necessary to serve a compelling state interest and that it is narrowly drawn to achieve that end. Id. (quoting Carey v. Brown, 447 U.S. 455, 461 (1980)). The state may also enforce regulations of the time, place, and manner of expression which are content-neutral, are narrowly tailored to serve a significant government interest, and leave open ample alternative channels of communication. Perry Educ. Ass'n v. Perry Local Educators' Ass'n, 460 U.S. 37, at 45 (1983); United States Postal Service v. Council of Greenburgh, 453 U.S. 114, 132, (1981); Consolidated Edison Co. v. Public Service Comm'n, 447 U.S. 530, 535-536, (1980); Grayned v. City of Rockford, supra, 408 U.S., at 115; Cantwell v. Connecticut, 310 U.S. 296, 60 S.Ct. 900, 84 L.Ed. 1213 (1940); Schneider v. State of New Jersey, 308 U.S. 147 (1939). Even in spaces which are not by tradition or designation a forum for public communication can not be subjected to a blanket and absolute speech prohibition. The state may reserve the forum for its intended purposes, communicative or otherwise, as long as the regulation on speech is reasonable and not an effort to suppress expression merely because public officials oppose the speaker's view. Perry Educ. Ass'n v. Perry Local Educators' Ass'n 460 U.S. 37.

Hence, since peaceful political protest and manifestation in public *fora*, such as the premises of the Capitol Hill of Puerto Rico, is a protected a exercise of freedom of speech, any unreasonable interference from the police, in the absent of a clear and present danger and in the absent of a fair warning to disperse, could give rise to a federal cause of action under the First Amendment of the U.S. Constitution. Papineu, supra. See also Dellums v. Powell, 566 F.2d 167, 195 (D.C. Cir., 1977) (Illegal arrests preventing a group of persons to engage in a protected demonstration to express their political views from the Capitol Hill, constitutes loss of First Amendment rights in their most pristine and classic form.)(quoting Edwards v. South Carolina, 372 U.S. 229, 235, (1963)).

In the case at bar, it is specifically alleged that on June 30th, 2012, plaintiffs were participating in a protected peaceful demonstration on the North Plaza of the Capitol Hill, a traditionally recognized as a public forum (See 1st Amended complaint at ¶¶ 3.1 and 3.5). Their protected free speech activity was abruptly interrupted when the defendants, Police Officers 1 thru10 and Agent Sanchez, following the direct orders of the Supervisory Defendants, charged against the plaintiff in a violent display of excessive force with no other motive but to suppress their First Amendment Rights and without any fair warning to disperse. (See 1st Amended Complaint at ¶¶ 3.5- 3.11). Hence, in the case at bar the complaint successfully articulates violations of plaintiffs' rights under the First Amendment.

**B.      PLAINTIFFS' FOURTH AMENDMENT CLAIM**

Supervisory defendants contend that "the factual matter in the complaint does not establish that any of the Supervisory Defendants used excessive force, searched or seized the plaintiffs" and that the illegal conduct are exclusively to attributed to the line officers. (See Docket 26 at page 36). As thoroughly discussed in a previous section in this motion, Supervisory Defendants are responsible for their own acts and omissions in personally ordering, directing, and allowing the excessive use of force against the plaintiffs. See e.g. Keating v. City of Miami, supra; and Rivera v. Toledo, supra.

In Graham v. Connor, the Supreme Court held that when the excessive force claim, deadly or not, arises in the context of an arrest or investigatory stop of a free citizen, it is most properly characterized as one invoking the protections of the Fourth Amendment, which guarantees citizens the right "to be secure in their persons . . . against unreasonable . . . seizures" of the person. Determining whether the force used to effect a particular seizure is "reasonable" under the Fourth Amendment requires a careful balancing of "`the nature and quality of the intrusion on the individual's Fourth Amendment interests'" against the countervailing governmental interests at stake. Graham v. Connor, 490 U.S. 386, (1989) United States v. Place, 462 U.S. 696, 703 (1983) Saucier v. Katz, 533 U.S.194 at 205.

To establish a Fourth Amendment violation based on excessive force, a plaintiff must show that the defendant officer employed force that was

unreasonable under the circumstances. <u>Jennings v. Jones</u>, 499 F.3d 2, 11 (1st Cir.2007); see <u>Graham</u>, 490 U.S. at 397, 109 S.Ct. 1865. Whether the force used is reasonable "must be judged from the perspective of a reasonable officer on the scene." <u>Graham</u>, 490 U.S. at 396, 109 S.Ct. 1865; see <u>also Tavarez-Guerrero</u>, 573 F.Supp.2d at 514. The reasonableness inquiry is objective, to be determined "in light of the facts and circumstances confronting [the officer], without regard to their underlying intent or motivation." <u>Graham</u>, 490 U.S. at 397, 109 S.Ct. 1865. Moreover, "the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight," are of specific relevance. <u>Id</u>. at 396, 109 S.Ct. 1865. This District Court has held that "[t]he use of excessive force or restraints that cause unnecessary pain or are imposed for a prolonged and unnecessary period of time are certainly unreasonable actions." <u>Tavarez-Guerrero</u>, 573 F.Supp.2d at 514.

In the instant case, allegations describe in detail the display of unjustified police brutality carried out by the defendants against the plaintiff, ordered and condoned by the Supervisory Defendants. A simple review of the complaint reveals in detail that in several occasions the plaintiffs were pepper sprayed, struck with night stick (in prohibited areas of their bodies in violation of police protocols), pushed to the ground, beaten and tear gassed by the defendants. (See First Amended Complaint at ¶¶ 3.5-3.15) At no time the plaintiffs allege that the Supervisory Defendants personally committed the assault upon the plaintiffs.

But, as explained in a previous section, they are responsible for their own misconduct. See  Rodríguez Vázquez v. Cintrón, 160 F.Supp. 22d 204, 211(D.P.R.2001) (The "causation requirement can be satisfied even if the supervisor did not participate directly in the conduct that violated a citizen's rights ... if the supervisor knew of, overtly or tacitly approved of, or purposely disregarded the conduct."); see also Brenes-Laroche v. Toledo Davila, 682 F. Supp. 2d 179, 189 (D.P.R. 2010)

Hence, in the case at bar the complaint successfully articulates violations of plaintiffs' rights under the Fourth Amendment.

### C.    PLAINTIFFS' FOURTEENTH AMENDMENT CLAIM

Supervisory Defendants contend that Plaintiffs Fourteenth Amendment claim should be dismissed because the substantive due process claims asserted are governed by the Fourth Amendment. (See Docket Doc. 26 at page 37) However, it is plaintiffs' First Amendment claim which activates the Due Process protection.

The Due Process Clause of the Fourteenth Amendment provides that the State shall not "deprive any person of life, liberty, or property, without due process of law." U.S. Const. Amend. XIV. The First Amendment was made applicable to the States precisely through Fourteenth Amendment. Virginia v. Black 538 U.S. 343, 358 (2003). Hence it is the Fourteenth Amendment's due process guarantee which extends to individuals a federal right to free speech enforceable against the states. Gitlow v. New York, 268 U.S. 652, 666,(1925). Accordingly it has been ruled that The Fourteenth Amendment does not permit a

State to make criminal the peaceful expression of unpopular views. <u>Edwards</u>, <u>supra.</u> Protected speech or conduct like the one exercised by plaintiff is ordinarily entitled to protection under the First and Fourteenth Amendments <u>N. A. A. C. P. v. Claiborne Hardware Co.</u> 458 U.S. 886.

Because the First Amendment gives rise to a liberty interest in practicing freedom of speech, plaintiffs are entitled to due process before the State, through its officials, can burden plaintiffs' speech practice. Hence, in the case at bar the complaint successfully articulates violations of plaintiffs' rights under the Fourteenth Amendment.

### D. PLAINTIFFS' FIFTH AMENDMENT CLAIMS

Supervisory Defendants sustain that the due process clause of the Fifth Amendment does not apply in this case since the complaint only involves commonwealth actors. (See Docket Doc. 26 at page 39) But it is not the actors who provide the basis Plaintiffs' Fifth Amendment claim; it is the egregious nature of their action. Also, defendants ignore that the substantives component of due process recognized by the Fifth Amendment was made applicable to the states by the Fourteenth Amendment. <u>Hunterson v. Disabalo</u> 308 F.3rd 236, 248 (3rd Cir. 2002).

The Supreme Court has extended through the Fourteenth Amendment the substantive due process protections of the Fifth Amendment to actions performed by state officials. See e.g. <u>Troxel v. Granville,</u> 530 U.S. 57, 67 (2000). Although the Fifth Amendment's Due Process Clause states only that "[n]o person shall ... be deprived of life, liberty, or property, without due process of

law," see U.S. Const. Amendt. V, it unquestionably provides substantive protections for certain enumerated fundamental rights. See Raich v. Gonzales 500 F.3rd 850, 862 n. 11 (9th Cir. 2000) (citing Troxel v. Granville, 530 U.S. 57, 65, (2000))

In County of Sacramento v. Lewis, 523 US 833 (1997), at page 835, the Supreme Court noted that "prior cases have held the provision '[n]o State shall ... deprive any person of life, liberty, or property, without due process of law,' U.S. Const., Amendt. 14, § 1, to 'guarante[e] more than fair process,' (citations omitted) and to cover a substantive sphere as well, 'barring certain government actions regardless of the fairness of the procedures used to implement them, (citations omitted)."

In the context of police conduct, the Supreme Court held that only a purpose to cause harm unrelated to the legitimate object of arrest will satisfy the element of arbitrary conduct shocking to the conscience, necessary for a substantive due process violation. Id. at 836. The Supreme Court has further explained that in order to amount to a due process violation the police conduct must "do more than offend some fastidious squeamishness or private sentimentalism about combating crime too energetically." Rochin v. California, 342 U.S. 165, 172, (1952).

The complaint as drafted shows that the officers involved in each the incident of police abuse, directly supervised by the Supervisory Defendants, adopted a behavior so sadistic that it reflects a wicked intention to do harm against two defenseless women, one of them a minor. (See Docket Doc. 4 ¶¶

3.5- 3.11). Hence, defendants conduct, as narrated in the complaint, constitute fragrant violations of the substantive due process clause of the Fifth Amendment of the U.S. Constitution, made applicable to the states by the Fourteenth Amendment.

### E.     PLAINTIFFS' NINTH AND TENTH AMENDMENT CLAIM

Plaintiffs concede that at the moment the complaint lacks of enough facts to support a cause of action under the Ninth and the Tenth Amendment of the U.S. Constitution.

### F.     PLAINTIFFS'ALLEGATIONS DESCRIBE VIOLATIONS OF CLEARLY ESTABLISHED RIGHTS

In analyzing whether a right is clearly established, courts search "the decisions of the Supreme Court, [relevant] court of appeals, and the highest court of state in which the case arose. Owens ex rel. Owens v. Lott, 372 F.3rd 267, 279 (4th Cir. 2004). If there are no such decisions from courts of "controlling authority" the courts of review looks to determine whether there is "a consensus of cases of persuasive authority" from other jurisdiction. Wilson v. Layne, 526 U.S. 603, 617 (1999). Courts also consider whether the officer violated applicable governmental policies. Hope, 536 U.S. at 741-42.

Here the compelling and biding case law of the Supreme Court and the First Circuit and the District Court, as well as a strong consensus of cases of persuasive authority from other jurisdictions, sustain that plaintiffs' complaint plausibly presents violations of clearly established rights under the Constitution of the United States. As discussed in previous sections, it have been long recognized as clear violations of the Fourth, First and Fourteenth Amendment of

the Constitution the obstruction of a peaceful protest that take place in a traditional public forum, such as the Puerto Rico Capitol Hill, by resorting in police brutality. See *e.g.* <u>Boos v. Barry,</u> 485 U.S. 312, 318 (1988). (First Amendment protects political demonstrations and protests); <u>Shuttlesworth v. City of Birmingham,</u> 394 U.S. 147, 152 (1969)(describing the privilege of citizens to assemble, parade, and discuss public questions in streets and parks). <u>Edwards v. South Carolina</u> 372 U.S. 229 (1963) (Holding that arrest, conviction and punishment of group of Negroes for breach of the peace by marching peacefully on sidewalk around State House grounds to publicize their dissatisfaction with discriminatory actions against Negroes infringed their constitutionally protected rights of free speech, free assembly, due process and freedom to petition for redress of their grievances); <u>Headwaters Forest v. Def.,</u> 276 F3rd at 1130 (holding that "it would be clear to reasonable officer that it was excessive force to use pepper spray against the nonviolent protestors"); <u>Brenes-Laroche v. Toledo Davila</u>, 682 F. Supp. 2d 179,  (D.P.R. 2010) (Defendants, as trained police officers, must have known that beating or encouraging the beating of a non-threatening protesters suspected of non-violent criminal conduct for no apparent reason exceeds the bounds of the lawful use of force).

Also, as already discussed, after <u>Iqbal</u> the First Circuit Court of Appeals has sustained the validity of a 1983 cause of action under the supervisory liability theory when the supervisor is the "primary violator or direct participant in the rights-violating incident" and "if a responsible official supervises, trains, or hires a subordinate with deliberate indifference toward the possibility that deficient

performance of the task eventually may contribute to a civil rights deprivation.".

Sanchez v. Pereira-Castillo, 590 F.3rd 31, 49 (2009)

Finally, last year the Civil Rights Division of the Justice Department of Justice (DOJ) made public extensive report with regard to the compelling pattern and practice of Civil Rights violations within the P.R.P.D. **(See Attachment 2: Investigation of the Puerto Rico Police Department)**. During its investigation the DOJ considered a set of events of police misconduct and excessive force that took place from 2007, including specifically plaintiffs' case.[9] The investigation reveals that PRPD officers have engaged in a pattern and practice of excessive force in violation of the Fourth Amendment, unreasonable force and other misconduct designed to suppress the exercise of protected First Amendment rights; and unlawful searches and seizures in violation of the Fourth Amendment. As contributory factors of the pattern and practice of civil rights violations the report mentions the following: policies fail to guide officers on lawful policing practices; pre-service field training is insufficient; pre-service field training is insufficient; no external oversight of officer standards and training; tactical units have been allowed to develop violent subcultures and Inoperable risk management system among others things. It was found that the constitutional

---

[9]   Among the events considered by the DOJ for its investigation are the killing of family members by two police officers in the "Massacre of Las Piedras" in 2007; the videotaped shooting of a civilian by a Tactical Operations Unit ("TOU") officer during a birthday celebration in Humacao in 2007; the shooting death of a PRPD lieutenant by a sergeant at a police station in Yabucoa in 2007; the conviction of multiple officers assigned to the Mayagüez Drug Unit for planting drugs in 2008; the conviction of the director of the Special Arrests and Extraditions Unit and several of his officers on drug-related charges in 2009; the conviction of a lieutenant directing the weapons registry at PRPD headquarters as part of an illegal gun licensing scheme in 2009; the indiscriminate use of batons and chemical irritants against protesters at the Capitol in June 2010; the shooting death of an unarmed young man who was reportedly aiding police following a robbery in September 2010; and the arrest of 61 PRPD officers as part of the largest police corruption operation in the Federal Bureau of Investigation's ("FBI") history in October 2010. (See Attachment 2 at page 6)

violations within the DOJ are pervasive and plague all levels of PRPD. **(See Attachment 2, pages 8-10).**

According to the report demonstrators are frequently the target of PRPD's use of unreasonable force.  Specifically, in direct allusion to plaintiffs' case it was found that officers use batons, chemical agents, and other physical force indiscriminately against individuals who are either participants or bystanders in protests and who pose little or no threat to officers or others.  The DOJ noted that "PRPD's repeated reliance on indiscriminate and unreasonable force instills fear in individuals and discourages future actions protected by the First Amendment".  According to the report, the actions of PRPD officers during demonstrations have been widely reported in the press and have prompted criticism within Puerto Rico and nationally. **(Attachment 2, pages 25-32)**

Hence, from public policy standpoint and based on the DOJ's finding, the conduct described in the complaint certainly constitute violations of clearly established rights under the First and the Fourth Amendment.

## VIII.   PLAINTIFFS SATE LAW CLAIM UNDER SUPPLEMENTAL JURISDICTION

Finally, Supervisory Defendants request this Honorable Court to dismiss the supplemental claims brought under the Law of Puerto Rico.  However, as discussed above, the plaintiffs have established a cognizable cause of action under federal law, and hence, any supplemental claim should be maintained pursuant to 28 U.S.C. sec. 1367. Accordingly, in cases involving both federal-law and state-law claims, state-law claims fall within supplemental jurisdiction of

federal courts. <u>Wisconsin Dept. of Corrections v. Schach,</u> 524 U.S. 381 (1998). In any event, as the First Circuit has explained, citing 28 U.S.C. § 1367(c)(3), "[i]n a federal-question case, the termination of the foundational federal claim does not divest the district court of power to exercise supplemental jurisdiction but, rather, sets the stage for an exercise of the court's informed discretion." <u>Roche v. John Hancock Mut. Life Ins. Co.</u>, 81 F.3d 249, 256-57 (1st Cir.1996). Accordingly, the dismissal of Plaintiff's section 1983 claims does not necessarily "strip[ ] the court of power to exercise jurisdiction over the remaining state-law claims." Id. at 256. See also <u>Rodriguez v. Doral Mortgage Corp.,</u> 57 F.3d 1168, 1177 (1st Cir.1995).[10]

X.    CONCLUSION

For the reasons stated above this Honorable Court should DENY defendants' motion to dismiss.

WHEREFORE, Plaintiffs respectfully request this Honorable Court to denied defendants' motion to dismiss.

I HEREBY CERTIFY that on this same date I electronically filed the forgoing with the Clerk, through the CM /ECF system, which will notify such filing to Carlos E. Cardona-Fernández, Esq; and David Rodriguez-Burns. Esq.

RESPECTFULLY SUBMITTED

In San Juan Puerto Rico, this 19th Day of March 2012.

s/ HARRY ANDUZE MONTAÑO
HARRY ANDUZE MONTAÑO-114610

s/ JOSE A. MORALES BOSCIO
JOSE A. MORALES BOSCIO-220614

---

[10]  Section E and J of the Motion to Dismiss, regarding 11th amendment immunity and claims against the Commonwealth, are simply without merit given the fact that the Commonwealth of Puerto Rico is not a party in this case. For this reason, this Honorable Court should disregard and deny these arguments.

1454 Avenida Fernández Juncos
San Juan PR  00909
Tel.    (787) 723-7171
Fax    (787) 723-7278
E-Mail handuze@microjuris.com
E-Mail jmoralesb@microjuris.com

For:
The American Civil Liberties Union
Puerto Rico National Chapter


*S/ JOSUE GONZALEZ-ORTIZ*

JOSUE GONZALEZ-ORTIZ- 221808
Staff Attorney
E-Mail jgonzalez-ortiz@aclu.org


WILLIAM RAMIREZ-HERNANDEZ, Esq
Executive Director
E-Mail wramirez@aclu.org

American Civil Liberties Union
Puerto Rico National Chapter
Union Plaza, Suite 1105
416 Ave. Ponce de León
San Juan, Puerto Rico, 00918
T. 787-752-8493
F. 787-753-4268