## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

BETTY PEÑA-PEÑA, et al.

      Plaintiffs,

              v.

JOSE FIGUEROA-SANCHA, et al.

      Defendants.

**Civil No. 11-1624 (SEC)**

## OPINION AND ORDER

Before the Court are co-defendants' motion to dismiss (Docket # 26), plaintiffs' opposition thereto (Docket # 39), and the respective reply memoranda (Dockets # 49 and 57). After reviewing the filings and the applicable law, co-defendants' motion is **GRANTED** in part and **DENIED** in part.

### Factual and Procedural Background

Early on June 30, 2010, students from the University of Puerto Rico, community leaders, members of labor organizations, and the general public began to gather in front of the Capitol building in San Juan. They were there to protest several legislative measures pending for approval on the Senate floor. Also there was a large contingency of police officers. The Senate President had ordered the closing of the public galleries, so the police had been summoned to keep the general public from entering the building.

By the evening hours the crowd had grown larger. And the police had lined up shoulder-to-shoulder along the entrance of the Capitol, batons and other anti-riot devices ready on hand. Violence erupted soon thereafter. Media outlets around the world disseminated the unfortunate events. Video footage showed the officers firing tear gas and fiercely wielding batons against whomever dared to cross their path.

This federal question suit arises from the events of that day. Docket # 46.[1] Plaintiffs are Betty Peña-Peña, and her then seventeen-year old daughter, E.R.P (collectively, "Plaintiffs"). Id.[2] Peña-Peña, a public school teacher, and E.R.P., a freshman to be at the University of Puerto Rico, had arrived at the grounds of the Capitol in the afternoon and remained there in peaceful protest when the police charged the crowd. Id. According to the complaint, the police battered both Plaintiffs. They allege being struck with anti-riot batons; indiscriminately sprayed with highly toxic tear gas and mace; hit and kicked while on the ground; and brutally dragged around by their feet. Id. The complaint is legally predicated on the First, Fourth, Fifth, Ninth, and Tenth Amendments to the U.S. Constitution, as well as on the Constitution and laws of the Commonwealth of Puerto Rico. Id.

Defendants are (1) the former Superintendent of the Puerto Rico Police Department, Jose Figueroa-Sancha;[3] (2) the Auxiliary Superintendent, Jose Rosa-Carrasquillo; (3) the Auxiliary Superintendent of Field Operations, Leovigildo Vazquez; (4) the Commanding Officer of the Tactical Operations Unit, Hector M. Figueroa-Torres; (5) the Regional Director of San Juan, Miguel Mejias-Cruz (together with all prior defendants, the "Supervisors"); and (6) Police Officer, Angel Sanchez-Mendez ("Officer Sanchez").[4] Defendants were present at the Capitol when the events underlying the complaint unfolded and each is sued in his personal and official capacity. A recount of the factual allegations against them follows.

The gradual congregation of people outside the Capitol building came at no surprise

---

[1] The preceding narrative is a matter of public knowledge in this district and is presented here for contextual background only.

[2] Local Rule 5.2(a)(2) requires minor children to be named by their initials.

[3] Figueroa-Sancha resigned in the summer of 2011.

[4] The complaint also named different John Doe defendants, but Plaintiffs never served process upon them.

to the police. Acting on Figueroa-Sancha's direct instructions, a large number of police officers—including the Supervisors and both the Tactical Operations Unit and the Special Tactical Unit—waited inside the Capitol well before people began to arrive. As the crowd grew larger, observers from the Puerto Rico Bar Association offered to mediate between the police and the people, but the police ignored them. At approximately 6:45 p.m., the police addressed the crowd through a megaphone, ordering people to move elsewhere. Seconds later, the Supervisors ordered a highly toxic form of tear gas known as "CN Tear Gas" to be fired against the crowd, and the Tactical Operations Unit went in charging.

Officer Sanchez raised his 36" riot baton above his helmet and then struck E.R.P. close to her right temple. Peña-Peña, who at the time stood by her daughter, suffered the same luck at the hands of another officer. Now lying on the ground, Plaintiffs inhaled tear gas and became suffocated. The blows kept on coming regardless.

Officer Sanchez kicked E.R.P. while other officers hit her with batons. Peña-Peña threw herself on top of her daughter to appease the attackers, but Officer Sanchez and fellow officers continued unabated. Officer Sanchez next pepper sprayed E.R.P. and dragged her away by the feet. Peña-Peña attempted to reach her daughter, but Officer Sanchez grabbed her by the throat, threatened her with his baton, and pepper sprayed her directly into the eyes.

With the help of bystanders, mother and daughter eventually reunited in a nearby lawn. They were crying, visibly shaken, beaten, and injured. Both received first aid services from an onsite paramedic. And the next day both visited a physician, who treated them for head and body traumas, severe irritation from nose to lungs, and chest palpitations. Co-defendant Figueroa-Sancha, meanwhile, appeared on the local news media and publicly owned up to the events at the Capitol building: he admitted being there from the very beginning and directly and expressly authorizing all actions the police had taken against the

4

crowd.[5]

This suit ensued almost a year later. As stated previously, Plaintiffs claim several constitutional violations, all actionable under 42 U.S.C. § 1983. Among other things, the complaint avers that Plaintiffs' injuries were caused by the Supervisors' "failure to act properly and failure to train, supervise and control police officers, procedures and operations." Docket # 46, ¶ 3.24.  It also states that the Supervisors failed to establish protocols on the use of force, on the use of chemical agents, and on riot police and crowd control policies. Furthermore, Plaintiffs contend that "the complaint process adopted by Jose Figueroa-Sancha . . . have led to a culture of impunity within the police force that ultimately encourages and stimulates police abuse and violence, such as the incident [underlying] this complain." Docket # 46, ¶ 3.21.

After preliminary procedural nuances the Supervisors moved to dismiss under Fed. R. Civ. P. 12(b)(6). They rely on both the Eleventh Amendment and qualified immunity as one line of defense. The Supervisors also argue that the complaint falters under Ashcroft v. Iqbal, 556 U.S. 662, 679 (2009), because it fails to link them directly to the events at issue. Similarly, they challenge the legal sufficiency of Plaintiffs' constitutional claims. In response, Plaintiffs concede some of their claims (that is, the Ninth and Tenth Amendment claims as well as the official capacity claims), but vehemently oppose all arguments against the imposition of personal liability on the Supervisors.[6]

---

[5] The local media also showed a police officer unholstering his gun and frantically firing several rounds into the air.  Plaintiffs allege that this officer had over 25 administrative claims pending against him but that the Supervisors allowed his involvement in the operation anyway. Docket # 46, p. 12.

[6] Plaintiffs conceded their official capacity claims by failing to oppose the Supervisors' Eleventh Amendment contentions, which the Court found supported by applicable law. The official capacity claims against the Supervisors are accordingly **DISMISSED with prejudice**.

**Standard of Review**

To survive a Rule 12(b)(6) motion to dismiss, Plaintiffs' "well-pleaded facts must possess enough heft to show that [they are] entitled to relief." Clark v. Boscher, 514 F. 3d 107, 112 (1st Cir. 2008). In evaluating whether Plaintiffs are entitled to relief, the court must accept as true all well-pleaded facts and indulge all reasonable inferences in plaintiff's favor. Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 557 (2007). The First Circuit has held that "dismissal for failure to state a claim is appropriate if the complaint fails to set forth factual allegations, either direct or inferential, respecting each material element necessary to sustain recovery under some actionable legal theory." Gagliardi v. Sullivan, 513 F. 3d 301, 305(1st Cir. 2008). Courts "may augment the facts in the complaint by reference to documents annexed to the complaint or fairly incorporated into it, and matters susceptible to judicial notice." Id. at 305-306.

Nevertheless, in judging the sufficiency of a complaint, courts must "differentiate between well-pleaded facts, on the one hand, and 'bald assertions, unsupportable conclusions, periphrastic circumlocution, and the like,' on the other hand; the former must be credited, but the latter can safely be ignored." LaChapelle v. Berkshire Life Ins., 142 F.3d 507, 508 (1st Cir. 1998)(quoting Aulson v. Blanchard, 83 F.3d 1, 3 (1st Cir.1996)); see also Buck v. American Airlines, Inc., 476 F. 3d 29, 33 (1st Cir. 2007); Rogan v. Menino, 175 F.3d 75, 77 (1st Cir. 1999). Thus, Plaintiffs must rely on more than unsupported conclusions or interpretations of law, as these will be rejected. Berner v. Delahanty, 129 F.3d 20, 25 (1st Cir. 1997) (citing Gooley v. Mobil Oil Corp., 851 F.2d 513, 515 (1st Cir. 1988)).

Moreover, "even under the liberal pleading standards of Fed R. Civ. P. 8, the Supreme Court has recently held that to survive a motion to dismiss, a complaint must allege 'a plausible entitlement to relief.'" Twombly, 550 U.S. at 559 (cited in Rodriguez-Ortíz v. Margo Caribe, Inc., 490 F.3d 92 (1st Cir. 2007)). Although complaints do not need detailed factual allegations, the plausibility standard is not akin to a "probability requirement," but

it asks for more than a sheer possibility that a defendant has acted unlawfully. Twombly, 550 U.S. at 557.

In Iqbal, the Supreme Court reaffirmed Twombly and clarified that two underlying principles must guide a court's assessment of the adequacy of pleadings when evaluating whether a complaint can survive a Rule 12(b)(6) motion. 556 U.S. at 662. First, the court must identify any conclusory allegations in the complaint as such allegations are not entitled to an assumption of truth. Id., 677-79. Specifically, the court is not compelled to accept legal conclusions set forth as factual allegations in the complaint. Id. Further, "threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Id. (citing Twombly, 550 U.S. at 555); see also Peñalbert-Rosa v. Fortuño-Burset, 631 F.3d 592, 595 (1st Cir. 2011) ("[S]ome allegations, while not stating ultimate legal conclusions, are nevertheless so threadbare or speculative that they fail to cross the line between the conclusory to the factual."). In other words, "[a] plaintiff is not entitled to 'proceed perforce' by virtue of allegations that merely parrot the elements of the cause of action." Ocasio-Hernandez v. Fortuño-Burset, 640 F.3d 1, 12 (1st Cir. 2011).

Second, a complaint survives only if it states a plausible claim for relief. Twombly, 550 U.S. at 557. Thus, any nonconclusory factual allegations in the complaint, accepted as true, must be sufficient to give the claim facial plausibility. Id. A claim has facial plausibility when the pleaded facts allow the court to reasonably infer that the defendant is liable for the specific misconduct alleged. Id. Such inferences must amount to more than a sheer possibility and be as plausible as any obvious alternative explanation. Id. Plausibility is therefore a context-specific determination that requires the court to draw on its judicial experience and common sense. Id.

The aforementioned requirements complement a bedrock principle of the federal judicial system: a complaint must contain enough detail to give "a defendant fair notice of the claim and the grounds upon which it rests." Ocasio-Hernandez, 640 F.3d at 8 (citing Fed.

R. Civ. P. 8(a)(2)). Accordingly, "[w]hile a plaintiff's claim to relief must be supported by sufficient factual allegations to be plausible under <u>Twombly</u>, nothing requires a plaintiff to prove her case in the pleadings." <u>Chao v. Ballista</u>, 630 F.Supp. 2d 170, 177 (D.Mass. 2009). Put differently, even after <u>Twombly</u> and <u>Iqbal</u>, "[d]ismissal of a complaint under Rule 12(b)(6) is inappropriate if the complaint satisfies Rule 8(a)(2)'s requirement of a short and plain statement of the claim showing that the pleader is entitled to relief." <u>Ocasio-Hernandez</u>, 640 F.3d at 11.

### Applicable Law And Analysis

#### I. Claims under the U.S. Constitution

The Court's analysis begins with 42 U.S.C. § 1983, which is the statutory predicate for the vindication of federal rights elsewhere conferred. <u>See e.g.</u>, <u>Graham v. Connor</u>, 490 U.S. 386, 393-94 (1989). To prove liability under § 1983, a "plaintiff[] must show by a preponderance of the evidence that (1) the challenged conduct was attributable to a person acting under color of state law; and (2) the conduct deprived the plaintiff of rights secured by the Constitution or laws of the United States." <u>Velez-Rivera v. Agosto-Alicea</u>, 437 F.3d 145, 151-52 (1st Cir. 2006). Moreover, under § 1983, government officials may only "be held liable if the plaintiff can establish [a] constitutional injury result[ing] from the direct acts or omissions of the official, or from indirect conduct that amounts to condonation or tacit authorization." <u>Rodriguez-Garcia v. Municipality of Caguas</u>, 495 F.3d 1, 10 (1st Cir. 2007) (internal quotation marks omitted). A plaintiff must therefore link each individual defendant to the alleged violation of federal rights. <u>Gonzalez-Piña v. Rodriguez</u>, 407 F.3d 425, 432 (1st Cir. 2005). In other words, each defendant responds for his own acts or omissions in light of his duties; there is no liability on the basis of *respondeat superior*. <u>Febus-Rodriguez v. Betancourt-Lebron</u>, 14 F.3d 87, 91-92 (1st Cir. 1994); <u>Rizzo v. Goode</u>, 423 U.S. 362, 375-77 (1976). Furthermore, the actionable conduct must be intentional, grossly negligent, or with reckless or callous indifference to established constitutional rights. <u>Gutierrez-Rodriguez v.</u>

8

<u>Cartagena</u>, 882 F.2d 553, 562 (1st Cir. 1989); <u>Simmons v. Dickhaut</u>, 804 F.2d 182, 185 (1st Cir. 1986).

Here, Plaintiffs' complaint satisfies the first prong of the § 1983 analysis, as all the decisions at issue in this case were taken under color of state law. The Supervisors do not dispute this point. They contend instead that Plaintiffs' complaint fails to establish a violation of a constitutional right. The Court addresses this contention below.

### A. First Amendment Claims

The analysis begins with Plaintiffs' First Amendment claims—that is, that their rights to freedom of speech and to peaceably assemble were improperly abridged when the police attacked them. In pertinent part, the First Amendment provides that "Congress shall make no law . . . abridging the freedom of speech . . . or the right of the people peaceably to assemble . . . ." U.S. Const. Amend. I. Ingrained in this provision is a national commitment to robust political debate, possible only through the safeguard of both free speech and associational rights. <u>Hustler Magazine, Inc. v. Falwell</u>, 485 U.S. 46, 51 (1988); <u>see also</u> <u>NAACP v. Alabama ex rel. Patterson</u>, 357 U.S. 449, 460-61 (1958) (freedom of association case); <u>De Jonge v. Oregon</u>, 299 U.S. 353, 364 (1937) ("The right of peaceably assembly is a right cognate to . . . free speech and . . . is equally fundamental."). The U.S. Supreme Court stated as much half a century ago:

> The vitality of civil and political institutions in our society depends on free discussion. . . . [I]t is only through free debate and free exchange of ideas that government remains responsible to the will of the people and peaceful change is effected. The right to speak freely and to promote diversity of ideas and programs is therefore one of the chief distinctions that sets us apart from totalitarian regimes.

<u>Terminiello v. City of Chicago</u>, 337 U.S. 1, 4 (1949) (internal citation omitted). For this reason, "speech on public issues occupies the highest rung of the hierarchy of First Amendment values, and is entitled to special protection." <u>Connick v. Myers</u>, 461 U.S. 138, 145 (1983).

Political demonstrations and protests fall squarely within the ambit of such protection. Boos v. Barry, 485 U.S. 312, 318 (1988). Indeed, the First Amendment protection of freedom of speech reaches its zenith under circumstances germane to demonstrations and protests: that is, when speech is provocative and challenging, when it "induces a condition of unrest, creates dissatisfaction with conditions as they are, or even stirs people to anger." Edwards v. South Carolina, 372 U.S. 229, 237 (1963).  Well-settled law therefore enjoins the police from "interfer[ing] with orderly, nonviolent protests merely because they disagree with the content of speech or because they simply fear possible disorder." Jones v. Parmley, 465 F.3d 46, 56 (2d Cir. 2006) (Sotomayor, J.) (citing applicable Supreme Court case law); see also Amnesty Intern., USA v. Battle, 559 F.3d 1170, 1183 (11th Cir. 2009) (discussing U.S. Supreme Court jurisprudence and holding that plaintiffs/demonstrators enjoyed a First Amendment right to be heard without unreasonable police interference). The protection the First Amendment provides is not unfettered, however.

"When clear and present danger of riot, disorder, interference with traffic upon the public streets, or other immediate threat to public safety, peace, or order, appears, the power of the state to prevent or punish is obvious." Cantwell v. State of Connecticut, 310 U.S. 296, 308 (1940). The state may also restrict the form and forum in which speech is disseminated. U.S. v. Grace, 461 U.S. 171, 178 (1983) ("We have generally rejected the assertion that people who wish to propagandize protests or views have a constitutional right to do so whenever and however and wherever they please."). In so-called public forums—places which by long tradition or by government fiat have been devoted to assembly and debate—the speech can be restricted only if necessary to advance a compelling state interest and any restriction must be narrowly drawn to achieve that end. Perry Educ. Ass'n v. Perry Local Educators' Ass'n, 460 U.S. 37, 45 (1983). The state nonetheless enjoys much broader latitude to restrict speech in its private property: just like any other "private owner of property, [the government] has the power to preserve the property under its control for the use to which it is lawfully dedicated." Greer v. Spock, 424 U.S. 828, 836 (1976); see also

Schenck v. Pro-Choice Network, 519 U.S. 357, 361 (1997) (finding that banning demonstrations close to doorways, parking lot entrances, driveways, and driveway entrances of a clinic does not violate the protesters free speech under the First Amendment).

It is on the latter precedent where the Supervisors attempt to dig their trenches. Their defense on this front is that "the Complaint fails to establish that plaintiffs were exercising their right to free speech in a public forum." Docket # 26, pgs. 34-35. Specifically, they find problematic that "plaintiffs do not establish with factual allegations that the parking lot [where they stood when charged,] which would reasonably contain privately and publicly owned vehicles[,] is a place historically associated with the exercise of expressive activities." Id. To prevail at this stage of the proceedings, however, the Supervisors needed to come up with much more than that. They, not Plaintiffs, had the onus of establishing that the area at issue was not a "public forum" for First Amendment purposes. But the Supervisors have provided the Court with absolutely nothing in this regard.  In fact, they rest their First Amendment challenge entirely on the two sentences just quoted, apparently expecting the Court to make the counterintuitive determination that the grounds of a state legislature building are not a public forum solely on the passing mention that privately owned vehicles were located there.  Such a lackluster effort  suffices to deny the Supervisors' First Amendment challenge. See United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at development argumentation, are deemed waived."). Not to mention that binding precedent weighs heavily against their position. See e.g. Edwards, 372 U.S. at 237 (finding the grounds of a state capitol an appropriate site for peaceful protest).

In any event, a determination that the area at issue constituted something other than a "public forum," without more, would do no good to the Supervisors. Among other things, they would still have to show that the police's intervention with Plaintiffs was necessary or legally proper to "preserve the property under [the governments'] control for the use to which it is lawfully dedicated." Greek, 424 U.S. at 836. None of the Supervisors' submissions

addresses this point, and the Court is aware of no First Amendment authority sanctioning the factual allegations advanced in Plaintiffs' complaint. In other words, Plaintiffs' complaint plausibly pleads that both their rights to freedom of speech and to peaceably assemble were improperly abridged when the police charged them; therefore, the Supervisors' motion to dismiss Plaintiffs' First Amendment claims is **DENIED**.

### B. The Fourth Amendment Claims

The Court turns now to Plaintiffs' Fourth Amendment excessive force claims. Under the Fourth Amendment citizens have the right "to be secure in their persons . . . ." U.S. Const. Amend. IV. As relevant in this case, a Fourth Amendment violation based on excessive force may lie where a defendant officer employs force that is unreasonable under the circumstances. Graham v. Connor, 490 U.S. 386, 397 (1989); see also Jennings v. Jones, 499 F.3d 2, 11 (1st Cir. 2008). Whether the force used is reasonable "must be judged from the perspective of a reasonable officer on the scene." Graham, 490 U.S. at 396; see also Tavarez-Guerrero v. Toledo-Davila, 573 F. Supp.2d 507, 514 (1st Cir. 2008). The reasonableness inquiry is objective, to be determined "in light of the facts and circumstances confronting [the officer], without regard to their underlying intent or motivation." Graham, 490 U.S. at 397. Courts therefore pay special attention to "the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." Id. at 396. Accordingly, in this circuit "[t]he use of excessive force or restraints that cause unnecessary pain or are imposed for a prolonged and unnecessary period of time are certainly unreasonable actions." Tavarez-Guerrero, 573 F. Supp.2d at 514.

The Supervisors pose no challenge to Plaintiffs' excessive force contentions. Rather, the Supervisors' thesis on this front is that "[t]he factual matter in the Complaint does not establish that any of the [Supervisors] used excessive force, searched or seized the plaintiffs. The conduct related to such claim for relief is attributable exclusively to the line officer

12

defendants." Docket # 26, pgs. 36-37. The Supervisors thus contend that the requisite casual connection between the alleged constitutional violation and them is missing. Id. This argument will be addressed below when the Court considers whether the complaint properly pleads supervisory liability claims. For now, it suffices to say that, if proven, the allegations that Plaintiffs were peacefully protesting when charged and beaten by the police present colorable Fourth Amendment claims, especially when one considers that Plaintiffs represented no threat whatsoever to the attacking officers.[7] For this reason, the Supervisors' motion to dismiss Plaintiffs' Fourth Amendment claims is **DENIED**.

### C. The Fifth Amendment Claims

The Supervisors' contentions as to Plaintiffs' Fifth Amendment claims stand on much stronger footing. In this regard, they correctly rely on Gerena v. Puerto Rico Legal Services, Inc., 697 F.2d 447, 449 (1st Cir. 1983), which holds that the Fifth Amendment due process clause applies to actions of the federal government, not those of private individuals, nor of state government. See also Public Utilities Commission v. Pollack, 343 U.S. 451, 462-64 (1983). Plaintiffs seek relief against employees of the Commonwealth of Puerto Rico without addressing the foregoing case law. The Court is therefore in no position to provide the relief requested; the Supervisors' motion to dismiss Plaintiffs' Fifth Amendment claims is **GRANTED** for that reason.

### D. The Fourteenth Amendment Claims

The same holds true for the Supervisors' contentions as to Plaintiffs' Fourteenth Amendment claims. An extensive discussion at this end is unnecessary. Both the U.S. Supreme Court and the First Circuit Court of Appeals have unequivocally and repeatedly rejected claims premised on the Fourteenth Amendment when protection is specifically available under other constitutional provisions. See e.g., Graham, 490 U.S. 386, 388

---

[7] Peña-Peña stands 5'1" and her daughter 5'6". Docket # 46, ¶ 3.7. Moreover, none of the Supervisors' submissions states that Plaintiffs were armed or that they resisted or attacked the police in any way.

("Because the Fourth Amendment provides an explicit textual source of constitutional protection against this sort of physically intrusive governmental conduct, that Amendment, not the more generalized notion of 'substantive due process,' must be the guide for analyzing these claims.") (citing Tennessee v. Garner, 471 U.S. 1, 7-22 (1985)); see also County Sand & Gravel Co. v. Town of S. Kingstown, 160 F.3d 834, 835 (1st Cir. 1998) ("When a specific provision of the Constitution protects individuals against a particular kind of [misconduct] by government actors, individuals seeking redress . . . must assert their claims under that particular constitutional rubric instead of invoking the more generalized notion of substantive due process."). Plaintiffs fail to address the foregoing case law, even though the Supervisors rely heavily on it. Instead, Plaintiffs concoct the following syllogism hoping it would save their Fourteenth Amendment claims:

> *Because the First Amendment gives rise to a liberty interest in practicing freedom of speech*, plaintiffs are entitled to due process before the State, through its officials, *can burden [their] speech practices*. Hence, in the case at bar the complaint successfully articulates violations of plaintiffs' rights under the Fourteenth Amendment"

Docket # 39, p. 33 (emphasis added). Little analysis is necessary to see how Plaintiffs' proffer plays directly into the Supervisors' hands. Hence, nothing else need be said; the Supervisors' motion to dismiss Plaintiffs' Fourteenth Amendment claims is **GRANTED**.

## II. Supervisory Liability

As stated above, the Supervisors also mount a defensive attack stating that Planitiffs' complaint fails to plead the requisite casual connection between them and the events at issue. Docket # 26, pgs. 6-24. In so doing, the Supervisors correctly point out the standard applicable to § 1983 supervisory liability claims: "Absent vicarious liability, each Governmental official, his or her title notwithstanding, is only liable for his or her own misconduct." Id., p. 8 (citing Iqbal, 556 U.S. at 677). Then they contend that "[a]s per the allegations of the Complaint, none of the Supervisory Defendants had a hand in the alleged constitutional violation by the line officers and thus, cannot be held liable under the

14

[applicable standard]." Id., pgs. 11-12. The Supervisors' contentions, however, are well off the mark.

For example, the complaint unequivocally states that the Supervisors were in the Capitol grounds before people began to gather and remained there when the crowd was attacked. Docket # 46, ¶¶ 3.4, 3.14-3.15. It also alleges that the Supervisors ordered Officer Sanchez and company to charge the crowd. Id. at ¶ 3.4. And that Figueroa-Sancha directly authorized all actions taken by the police on the day in question. Id. at ¶ 3.14. From these factual allegations, which the Court must presume truthful at this stage, it can be inferred that the Supervisors authorized the use of the highly toxic gas fired against the crowd as well as the deployment of batons and other anti-riot devices improperly wielded against Plaintiffs and other peaceful demonstrators. Further, the allegations also allow the Court to infer that the Supervisors stood by idly watching Officer Sanchez and company charge the crowd and attack Plaintiffs.  These allegations together with the inference they allow suffice to withstand dismissal at this juncture. See Sanchez v. Pereira-Castillo, 590 F.3d 31, 49 (1st Cir. 2009) ("Although Government officials may not be held liable for the unconstitutional conduct of their subordinates under a theory of respondeat superior, supervisory officials may be liable on the basis of their own acts or omissions. . . . [including supervising] with deliberate indifference toward the possibility that deficient performance of the task may contribute to a civil rights deprivation.") (internal quotations and citations omitted).

Still, the Supervisors insist that Plaintiffs allegations point to omissions rather than actions as allegedly required under the applicable standard. Docket # 46, p. 11. As recent as a month ago, however, the First Circuit Court of Appeals ruled out such contentions in Marrero-Rodriguez v. Municipality of San Juan, No. 11-1195, --- F.3d ----, 2012 WL 1571234, at *4 (1st Cir. May 7, 2012). There, after a training exercise had gone awry and resulted on the death of a police officer, his family filed a § 1983 suit against supervisors who were responsible for, but were absent from, the exercise. In reversing the district court's Fed. R. Civ. 12(b)(6) dismissal, the First Circuit noted:

> The complaint can, if read generously, be read to say they are not sued merely because they are supervisors who engaged in no misconduct themselves, but because they each had direct responsibility for the conduct of training exercises and had some active involvement in the structuring of the lethal training exercise that day, and that at least some should have been there that day.

Id. But even more to the point, the Court also stated that omissions such as "failure to implement policies, protocols, or correct training about use of live firearms" were also bases for the imposition of supervisory liability under § 1983. Id. see also Starr v. Baca, 652 F.3d 1202, 1205-07 (9th Cir. 2011) (§ 1983 supervisory liability proper against sheriff/defendant due to omissions and deliberate indifference); T.E. v. Grindle, 599 F.3d 583, 591 (7th Cir. 2010) ("When a state actor's deliberate indifference deprives someone of his or her protected liberty interest in bodily integrity, that actor violates the Constitution, regardless of whether the actor is a supervisor or a subordinate, and the actor may be held liable for the resulting harm.").[8] A similar conclusion is warranted in this case, where the complaint plausibly alleges that Plaintiffs' injuries were caused in part by the Supervisors' failure "to train, supervise and control police officers, procedures and operations" (Docket # 46, ¶¶ 3.15 and 3.24) as well as their failure to establish protocols on the use of force, on the use of chemical agents, and on riot police and crowd control policies (id. at ¶ 3.18).

The Supervisors make much of Plaintiffs' pleading strategy of using the conjunctions "and/or" as well as the word "defendants" to refer interchangeably to the Supervisors. Specifically, they contend that Plaintiffs' strategy runs contrary to Iqbal, as it " collectively refers to defendants in plural, without factual allegations describing the acts of each of the defendants." Docket # 26, p. 17. The Supervisors further believe that " Plaintiffs' use of the

---

[8] The Supervisors spend a significant portion of their submissions arguing that Iqbal ruled out § 1983 supervisory liability based on inaction or omission. Docket # 26, pgs. 6-25. As just stated, Plaintiffs' claims against the Supervisors are premised on both actions (the authorization to use force against Plaintiffs and other demonstrators) as well as on omissions (the failure to control the attacking officers and to institute proper policies and procedures). Accordingly, the Court need not address the Supervisors' argument on this issue. Nevertheless, upon a cursory analysis of the applicable case law, the Court is unpersuaded by the Supervisors' exposition.

symbol "and/or" . . . has both a conjunctive and a disjunctive effect, making it impossible to determine exactly which of the supervisory defendants gave the alleged order to intervene with the protesters." Docket # 49, pgs. 9-10. Plaintiffs' strategy, however, falls squarely within the contours of Fed. R. Civ. P. 20(a)(2)(A). Among other things, this rule allows the joinder of defendants if "any right to relief is asserted against them . . . in the alternative with respect to or arising out of the same transaction, occurrence, or series of transactions or occurrences." Id. Rule 20 comes into play, when, as here, "the substance of plaintiff's claim indicates that plaintiff is entitled to relief from someone, but the plaintiff does not know which of two or more defendants is liable under the circumstances set forth in the complaint." 7 Wright, Miller & Kane, Federal Practice and Procedure § 1654 (3d ed. 2011).

The Supervisors' position is problematic for other reasons. The court in Koch v. I-Flow Corp., 715 F.Supp. 2d 297, 302 n. 2 (D.R.I. 2010) fitly stated one of them,  in denying a motion to dismiss in which defendants advanced the same "and/or" argument:

> Plaintiffs who plead against alternative defendants sometimes state and restate each claim repeatedly, each time naming an alternate defendant. To insist that this redundant format be followed would be to elevate technical form over substance, and would be contrary to the intent of the Federal Rules' liberal pleading requirements.

Another reason is provided in Ocasio-Hernandez, where the First Circuit established that the relevant inquiry under Iqbal is limited to whether the complaint affords each named defendant with proper notice of the actionable facts, regardless of the form in which those facts are presented. 640 F.3d at 12-13. Plaintiffs' complaint easily satisfies this threshold. It contains specific factual allegations regarding both the actions and omissions underlying their causes of action. Granted, at this stage of the proceedings, Plaintiffs have a long way to go in order to prove the claims against each supervisor.  But the Supervisors cannot claim to be in the dark as to the factual issues at stake in the case or as to the direction in which to aim discovery. Indeed, the vigorous motion practice they have put forth at this stage evince the contrary.

In short, the Court is satisfied that Plaintiffs' complaint pleads plausible supervisory liability claims against the Supervisors. Remarks made in <u>Marrero-Rodriguez</u> provide proper closure under this scenario: "The role of these defendants can be made clearer in discovery and nothing precludes later efforts to end the case against them should discovery not substantiate the [Court's] inferences." 2012 WL 1571234, at *4. The Supervisors' motion to dismiss Plaintiffs' § 1983 supervisory liability claims is therefore **DENIED**.

*III. Qualified Immunity*

The Court's focus now shifts to the qualified immunity doctrine, which the Supervisors contend shields them from this litigation. Qualified immunity is an affirmative defense against personal liability which may be raised by state officials. Whitfield v. Melendez-Rivera, 431 F. 3d 1, 6 (1st Cir. 2005). It "provides a safe harbor for public officials acting under the color of state law who would otherwise be liable under 42 U.S.C. §1983 for infringing the constitutional rights of private parties." Id.; see also Anderson v. Creighton, 483 U.S. 635, 638 (1987).

The qualified immunity inquiry is a two-part test. Pearson v. Callahan, 555 U.S. 223, 231 (2009). That is, a "court must decide (1) whether the facts alleged or shown by the plaintiff make out a violation of a constitutional right; and (2) if so, whether the right was 'clearly established' at the time of the defendant's alleged violation." <u>Maldonado v. Fontanes</u>, 568 F.3d 263, 268-269 (1st Cir. 2009). The second step of this analysis, in turn, has two aspects. One aspect focuses on the clarity of the law at the time of the alleged civil rights violation, and the other focuses more concretely on the facts of the particular case and whether a reasonable defendant would have understood that his conduct violated the plaintiffs' constitutional rights. Id. at 269.

In this case, the Court has already established that Plaintiffs' complaint ably pleads claims under the First and Fourth Amendments to the U.S. Constitution. Furthermore, the case law highlighted above shows that Plaintiffs' constitutional rights (rights to freedom of speech, to peaceably assemble, and to be secured in their persons) were clearly established

at the time of the events underlying the complaint. At this stage of the proceedings, however, the Court is unable to make the factual determinations that must underpin any ruling on qualified immunity. If appropriate, the Supervisors may restate this defense at a later stage.

*IV. Supplemental State-Law Claims*

Because the Supervisors' plea for the dismissal of Plaintiffs' state-law claims assumes the dismissal of all of their federal-law claims, the Court need not address the same.

**Conclusion**

The well-being of every civilized society depends on a healthy relationship between law abiding citizens and those in charge of law enforcement. That relationship must be built and nurtured through mutual trust and respect. Sadly, the Puerto Rico Police Department has been poorly judged in this regard recently. A few months ago, the U.S. Department of Justice issued a report documenting instances of police abuse as well as a pattern of civil and constitutional rights violations. The events at the Capitol building on June 30, 2010 figured prominently in such report. True, the evidentiary value of the report is an open question at this juncture. But that it evinces a breakdown on the relationship between the police and the Puerto Rican people is beyond debate.

An opportunity for healing at both ends is presented in this lawsuit. The Court therefore urges counsel for the parties to work vigorously and thoroughly to unearth the facts of this case. With the facts at hand, counsel then ought to sit down in good faith and together devise alternatives to mend the differences between the parties. The result of such endeavor will undoubtedly contribute to the healing process Puerto Rico so badly needs.

Of course, counsel's efforts must revolve around Plaintiffs' First and Fourth Amendment personal capacity claims as well as those under the Constitution and laws of Puerto Rico. Plaintiffs' other causes of action against the Supervisors are **DISMISSED with prejudice** in accordance with this Opinion.

**IT IS SO ORDERED.**

In San Juan, Puerto Rico, this 11th day of June, 2012.

*s/ Salvador E. Casellas*
SALVADOR E. CASELLAS
U.S. Senior District Judge